Elaine **PEDRAZA, on behalf of herself and all others similarly situated,** Plaintiff

v.

The **COCA–COLA COMPANY, M. Douglas Ivester, Douglas N. Daft, E. Neville Isdell, Coretha Rushing, the Coca–Cola Company Benefits Committee, the Coca–Cola Assets Management Committee, Barbara S. Gilbreath, Roualeyn Fenton–May, James Harwell, Kevin Cherry, David Taggart, Clyde Baros, Susan E. Shaw, Peggy Horn, Rena Holland, Kim Magee, Karen Macke, John Howland, James Chestnut, Linda Mincey, Gray Lindsey, Gary Fayard, Helen Jackson, Kevin Johnson, and Brett Taylor Defendants**

No. CIV.A. 1:05–CV–1256–.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 29, 2006.

---

Schiffrin & Barroway, Radnor, PA, Attorney of this firm who represents plaintiff: (Edward W. Chang, Esq.; Edward W. Ciolko, Esq.; Joseph H. Meltzer, Esq.; Mark K. Gyandoh, Esq.).

Parks Chesin & Walbert, Atlanta, GA, Attorneys of this firm who represent plaintiff: (David F. Walbert, Esq.; Larry Hugh Chesin, Esq.).

Greenfield Millican, P.C., Atlanta, GA, Attorneys of this firm who represent plaintiff: (Lisa T. Millican, Esq.).

Alston & Bird, Atlanta, GA, Attorneys of this firm who represent defendants: (Howard Douglas Hinson, Esq.; Patrick Connors DiCarlo, Esq.).

King & Spalding LLP, Atlanta, GA, Attorneys of this firm who represent defendants: (David Tetrick, Jr. Esq.; L. Joseph Loveland, Jr. Esq.).

John H. Lewis, Jr., Esq., The Coca–Cola Company, Atlanta, GA, (Corporate Counsel for defendant Coca–Cola).

## ORDER

EVANS, District Judge.

This is a putative class action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., in which Plaintiff seeks damages and equitable relief for Defendants' breach of fiduciary duty (a) in using Coca–Cola stock in Coca–Cola's Thrift and Investment Plan, and (b) in providing incomplete and misleading information regarding certain business affairs of the Coca–Cola Company to participants in the Thrift and Investment Plan. The case is before the Court on Defendants' Motion to Dismiss. For the following reasons, Defendants' Motion to Dismiss [# 32] is GRANTED as to Counts I and II, GRANTED IN PART as to Count III, and GRANTED as to Count IV.

### I. *Background*

#### A. *Initial Matters*

■ In ruling on the Motion to Dismiss, the well-pleaded averments of the Amended Complaint ("complaint") are presumed to be true, *Miree v. DeKalb County*, 433 U.S. 25, 26 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir.2004). The Court may also reference documents

attached to a motion to dismiss, and responses thereto, "but only where the attached document is 'central to the plaintiff's claim' and is 'undisputed' in the sense that 'the authenticity of the document is not challenged.'" *Woods v. Southern Co.*, 396 F.Supp.2d 1351, 1359 (N.D.Ga.2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir.2002) and *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir.2005)); see also, *La Grasta*, 358 F.3d at 845 ("In analyzing the sufficiency of the complaint, we limit our consideration to the well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed."). In the instant case, Defendants attached numerous exhibits to their Motion to Dismiss, and Plaintiff attached an exhibit to her Response.[1] Neither party has challenged the authenticity of the documents attached, and as they are each referenced in or central to the complaint, the Court will consider them.

### B. *Plaintiff*

Plaintiff was an employee of the Coca–Cola Company ("Coca–Cola" or "Coke" or "the Company") and was a participant in Coca–Cola's Thrift and Investment Plan ("the Plan") between May 13, 1997 and April 18, 2005 ("the Class Period").[2] Plaintiff acquired an interest in Coca–Cola stock through her participation in the Plan.[3]

### C. *Defendants*

Defendant the Coca–Cola Company is a multinational corporation. It manufactures, distributes and markets soft drink concentrates and other beverage products. Coca–Cola common stock is traded on the New York Stock Exchange. The Company is subject to the federal securities laws.

Defendants Ivester, Daft, and Isdell ("the CEO Defendants") each served as

---

1. Altogether, the exhibits attached to the Motion to Dismiss and the Response to the Motion to Dismiss are as follows:
   1. Defendants' Exhibit 1: Thrift and Investment Plan, Summary Plan Description, 2005;
   2. Defendants' Exhibit 2: Thrift and Investment Plan, 1999;
   3. Defendants' Exhibit 3: Coca–Cola Co. Annual Report, 1997;
   4. Defendants' Exhibit 4: Coca–Cola Co. Annual Report, 1998;
   5. Defendants' Exhibit 5: Coca–Cola Co. Annual Report, 1999;
   6. Defendants' Exhibit 6: Coca–Cola Co. Annual Report, 2000;
   7. Defendants' Exhibit 7: Coca–Cola Co. Annual Report, 2001;
   8. Defendants' Exhibit 8: Coca–Cola Co. Annual Report, 2002;
   9. Defendants' Exhibit 9: Coca–Cola Co. Annual Report, 2003;
   10. Defendants' Exhibit 10: Coca–Cola Co. Annual Report, 2004;
   11. Defendants' Exhibit 11: Coca–Cola Co. Stock Prices 1975–2005;
   12. Defendants' Exhibit 12: Coca–Cola Co. Stock Prices 1990–2005;
   13. Defendants' Exhibit 13: Coca–Cola Co. Close Stock Prices in the 1997–2005 Class Period;
   14. Defendants' Exhibit 14: Order Instituting Cease and Desist Proceedings, Making Findings and Imposing a Cease–and–Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, In the Matter of Coca–Cola Co., Securities Exchange Commission Administrative Proceeding File No. 3–11902, April 18, 2005; and
   15. Plaintiff's Exhibit 1: Coca–Cola Co. Thrift and Investment Plan, Trust Agreement, 1997.

2. The case has not been certified as a class action; however, the Amended Complaint is pleaded as a "class action complaint."

3. The Amended Complaint does not state when Plaintiff acquired her Coca–Cola stock and whether she acquired it through the Plan's bonus stock (ESOP) component. It is also unclear whether Plaintiff sold any of her stock, either during or after the Class Period.

Chair and CEO of Coca–Cola during the Class Period. The CEO defendants had the power to appoint and remove members of the Plan's Assets Management Committee, which made investment decisions for the Plan. Defendant Rushing served as Vice–President—Human Resources during the Class Period, as did other un-named persons ("the Vice–President Defendants"). The Vice–President Defendants had the power to appoint and remove members of the Benefits Committee, which was the Administrator of the Plan. The Benefits Committee[4] had the responsibility for providing information to Plan participants about the Plan.

Plaintiff's Complaint refers to the CEO Defendants and the Vice–President Defendants collectively as "the Officer Defendants."

Defendants Gilbreath, Fenton–May, Harwell, Cherry, Taggart, Baros, Shaw, Horn, Holland, Magee, Macke, and Howland were members of the Benefits Committee during the Class Period.

Defendants Chestnut, Mincey, Taggart, Lindsey, Horn, Fayard, Gilbreath, Jackson, Johnson, and Taylor were members of the Assets Management Committee during the Class Period.

### D. *Plaintiff's Allegations*

Plaintiff alleges the following. Coca–Cola's revenues flattened between 1997 and early 1998 and the price of its common stock declined by 36% between July and September 1998. In order to counter the revenue decline, Coca–Cola engaged in an unsustainable business practice, "gallon-pushing". Gallon-pushing involved Coca–Cola selling beverage concentrate to Coke's bottlers by offering favorable credit terms which encouraged bottlers to buy more concentrate than they needed to meet customer demand. This increased Coca–Cola's sales of beverage concentrate and boosted revenues in the short run; however, because the bottlers purchased concentrate in amounts that exceeded their actual needs, the increased sales were not sustainable, and by 1999 the bottlers began to resist purchasing unneeded beverage concentrate. At the end of 1999, Coca–Cola abandoned gallon-pushing. Coca–Cola never mentioned the "gallon-pushing" practice in its SEC filings covering the time from 1997 to January 1, 2000, although it did state in filings made in early 2000 that reduced bottler inventory levels in 2000 would result in lower earnings per share, specifically $.11 to $.13 per share in the first half of 2000.

Plaintiff alleges that the Russian economy nearly collapsed in 1998. Between August 1998 and September 1999 Coke sales in Russia declined 60%, whereas production costs quadrupled. Coca–Cola abandoned two large bottling factories in Russia before September 1999. Due to the impairment of its Russian assets, Coca–Cola wrote off $543 million in its January 26, 2000 report of financial results for the fourth quarter of 1999. Plaintiff alleges that Coca–Cola should have done this earlier, in its report for the third quarter of 1999.

In the report for the fourth quarter of 1999, Coca–Cola reported a $45 million net loss, the first such loss in a decade. Plaintiff asserts that the cessation of gallon-pushing, plus substantial writeoffs for im-

---

**4.** Formerly the Corporate Retirement Plan Committee and the Thrift and Investment Plan Committee.

paired assets were responsible. The complaint further states:

101. On January 27, 2000, THE WALL STREET JOURNAL reported: In a massive round of layoffs pushed by an activist board of directors, Coca–Cola Co. said it is slashing 20% of its work force, or 6,000 employees.

The embattled soft-drink giant said it would take $1.6 billion in one-time charges, far bigger than expected. More charges will follow this year, and Coke also warned that reducing shipments of soft-drink concentrate to bottlers selected by Coke would lower earnings in the first six months of the year.

The cuts were a bombshell . . . .

Plaintiff alleges that Coca–Cola's stock fell by 5% on January 27, 2000 and by 17% over the next ten days.

Plaintiff alleges that Coca–Cola sustained substantial losses from its operations in India in 1999. In its report of financial results for the first quarter of 2000, Coca–Cola wrote off $405 million in connection with its assets in India. Plaintiff alleges that this should have been done earlier, in the report for the last quarter of 1999.

In 2003, a former Coca–Cola employee filed a lawsuit[5] claiming that Coca–Cola had deceived business partner Burger King by rigging test promotions to make Coke's products appear more popular. In 2003, the SEC opened an informal investigation and the U.S. Attorney's Office conducted an investigation. Coca–Cola and Burger King agreed to a $21.1 million settlement. The same employee also alleged that Coke hid contamination created by defective beverage machines and failed to account for impaired assets related to the defects. The Complaint alleges that public awareness of these matters negatively affected the value of Coca–Cola stock.

On April 18, 2005, the SEC issued a consent cease and desist order against Coca–Cola, finding that it had filed materially misleading Forms 10–K[6] and 10–Q[7] for the reporting periods between 1997 and the end of 1999, in that gallon-pushing was not disclosed. Also, the Company had filed a materially misleading Form 8–K[8] in January 2000 for the fourth quarter of 1999. The Form 8–K had stated that Coca–Cola and its bottlers had agreed "over the past several months" to reduce concentrate inventory levels when in fact Coca–Cola's abandonment of the gallon-pushing practice did not occur until after the end of the reporting period covered by the 8–K, and the abandonment had been done unilaterally by Coca–Cola.

---

5. Apparently a "whistle blower" lawsuit.

6. Form 10–K is the form that § 13 or § 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m or § 78o(d), requires every issuer of a security to use for its annual reports, if no other form is prescribed. *See* 17 C.F.R. § 249.310 (2005).

7. Form 10–Q is the form that § 13 or § 15(d) of the Securities Exchange Act of 1934 requires every issuer of a security to use for its quarterly reports. *See* 17 C.F.R. § 249.308a (2005).

8. Form 8–K is the form used for "current reports" pursuant to § 13 or § 15(d) of the Securities Exchange Act of 1934. *See* 17 C.F.R. § 249.308 (2005). 17 C.F.R. § 240.13a–11 & § 240.15d–11 describe when current reports are required. *Id.* Form 8–K is also the form for reports of nonpublic information required to be disclosed by Regulation FD (17 C.F.R. §§ 243.100 & 243.101). *Id.*

While Coca–Cola stock went up and down in value during the Class Period, the overall trend was down. The stock closed at $66.50 on May 13, 1997 and at $40.97 on April 18, 2005.

During the Class Period, the Plan provided Summary Plan Descriptions (SPDs) to participants. The 2005 SPD [9] noted that it was part of a prospectus covering securities that had been registered with the SEC under the Securities Act of 1933, as amended, specifically, shares of common stock of the Coca–Cola Company issued to participants and employees under the Plan. In the part of the SPD labeled "Obtaining Further Information" participants were advised that the Company's periodic SEC filings would be provided to them along with mailings to other shareholders; also, the filings were available via the Company's website or upon oral or written request. That part of the SPD said that the SEC filings " ... are incorporated by reference into the registration statement and *this document*," (i.e., the SPD). Because of the above-referenced misleading statements (mainly regarding gallon-pushing, but also regarding the allegedly delayed writeoff of assets in Russia and India) which were incorporated by reference into the 2000 SPD, Plaintiff asserts that the SPD was misleading.

While Plaintiff's complaint is in four counts, she fundamentally makes two claims: first, she claims that corporate mismanagement, including certain improprieties caused the value of Coca–Cola common stock to decline during the Class Period; therefore, Coca–Cola and the other defendants breached the fiduciary duty of prudence under ERISA by offering only Coca–Cola stock in the ESOP component of the Plan, by including Coca–Cola stock in the choice-of-investment component of the Plan, by allowing the Plan to hold Coca–Cola stock in the Coca–Cola Stock Fund, and (perhaps) by restricting her ability to diversify out of Coca–Cola stock in the ESOP part of the Plan. Second, she contends that Defendants breached the fiduciary duty of loyalty under ERISA, by failing to inform Plan participants of certain non-public business information (mainly the gallon-pushing practice but also the allegedly delayed writeoffs of assets in Russia and India) which might have affected their decision to purchase or keep Coca–Cola stock.

## II. *Discussion*

### A. *Summary of Defendants' Main Arguments in the Motion to Dismiss*

Defendants argue that, as a matter of law, the circumstances outlined in the complaint are insufficient to establish that using Coca–Cola stock in the Plan was a breach of the fiduciary duty of prudence. Also, they argue that failing to advise Plan participants of certain nonpublic information (gallon-pushing, allegedly delayed writeoffs of assets in Russia and India) did not breach a fiduciary obligation under ERISA because (1) in making the subject SEC filings Coca–Cola was not acting as an ERISA fiduciary and (2) ERISA does not impose disclosure requirements regarding the employer/sponsor's finances; rather, ERISA disclosure requirements are only those spelled out in ERISA, which relate to the ERISA plan, not the employer's finances.

---

**9.** The 2005 SPD is the only one in the record. However, consistent with the averments of the complaint, the Court assumes that it is representative of other SPDs issued during the Class Period.

## B. *Standard on a Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) empowers the Court to grant a defendant's motion to dismiss when a complaint fails to state a claim upon which relief can be granted. The pleadings are construed broadly so that all well-pleaded facts are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Conner v. Tate,* 130 F.Supp.2d 1370, 1373 (N.D.Ga.2001). However, the court need not "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Additionally, "[c]onclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document ... reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir.1974).[10]

A motion to dismiss should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Linder v. Portocarrero,* 963 F.2d 332, 334 (11th Cir.1992).

## C. *ERISA*

Congress passed ERISA in 1974, in part, "to establish minimum standards of fiduciary conduct for Trustees, Administrators and others dealing with retirement plans ... and to improve the equitable character and soundness of private pension plans." H.R.Rep. No. 93–533 (1974), as reprinted in 1974 U.S.C.C.A.N. 4639, 4655. ERISA defines a fiduciary as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (2000). ERISA fiduciaries are held to the prudent man standard of care, which includes four duties: (1) to act solely in the interest of the participants and beneficiaries; (2) to exercise care, skill, prudence, and diligence; (3) to diversify the investments of the plan to minimize risk of loss unless imprudent to do so under the circumstances; and (4) to act in accordance with the documents and instruments governing the plan unless to do so would violate ERISA. *Id.* § 1104(a)(1).[11]

ERISA contains specific provisions for eligible individual account plans ("EIAPs")

---

**10.** This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**11.** ERISA provides that in the case of a pension plan which establishes individual accounts and allows participants to exercise control over the assets in their account, "no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control." 29 U.S.C. § 1104(c)(1)(B) (2000). Section 1104(c)(1)(B) is in the nature of an affirmative defense and therefore is inappropriate to consider at the motion to dismiss phase. *Woods v. Southern Co.,* 396 F.Supp.2d 1351, 1367 (N.D.Ga.2005). Defendants did not raise this provision in their Motion to Dismiss and the Court did not consider it in ruling on the motion.

such as Coke's Plan. An EIAP is an individual account plan which is "(i) a profit-sharing, stock bonus, thrift, or savings plan [or] (ii) an employee stock ownership plan," *Id.* § 1107(d)(3)(A), and which "explicitly provides for acquisition and holding of qualifying employer securities." *Id.* § 1107(d)(3)(B). Because EIAPs are designed to hold employer securities, they are excepted from ERISA's general prohibition against a plan acquiring or holding such securities in an amount greater than ten percent (10%) of the fair market value of the assets in the plan. *Id.* § 1107(a)(2).

For the same reason, EIAP fiduciaries do not have a duty to diversify and do not act imprudently by not diversifying the assets of an EIAP. ERISA explicitly states that "the diversification requirement ... and the prudence requirement (only to the extent that it requires diversification) ... is not violated by acquisition or holding of ... qualifying employer securities." *Id.* § 1104(a)(2).[12]

### D. *The Coca–Cola Thrift and Investment Plan ("the Plan")*

The Plan is an "eligible individual account plan", 29 U.S.C. § 1107(d)(3) under ERISA. It is a defined contribution plan in which no set level of appreciation or return is guaranteed. The level of appreciation (or depreciation) and return will vary depending on the relative success of the fund or stock in which a participant's money is invested. The Plan has two related investment components: (1) the employee choice-of-investment component and (2) the company match or Employee Stock Ownership Plan ("ESOP" component). A relationship between the components exists because an employee's contribution (normally through payroll deduction) triggers the acquisition of investment(s) in the choice-of-investment component as well as a matching contribution (up to a maximum of 3% of compensation) of Coca–Cola stock in the ESOP component. In other words, an employee who acquires investments in the choice-of-investment component would automatically acquire an interest in Coca–Cola stock in the ESOP component. Therefore, all participants in the Plan hold Coca–Cola stock, even if they did not choose Coca–Cola stock in the choice-of-investment component.

### 1. *Choice–of–Investment Component*

This component of the Plan enables qualifying employees to deduct a percentage of their salary on either an after-tax or pre-tax basis, and invest that money in various investment funds.[13] The Plan states "Each Participant ... shall direct

---

**12.** Plaintiff argues that § 1104(a)(2) does not apply to the Plan because the Plan is not an ESOP. Plaintiff has misread § 1104(a)(2), which does not address ESOPs. Instead, § 1104(a)(2) offers an exemption for EIAPs, and as Plaintiff admits that the Plan is an EIAP, it is appropriate to apply § 1104(a)(2)'s protection to the Plan.

**13.** The investment options offered under the Plan as of 2005 were spelled out in the "How Your Account is Invested" Section on pages 12–13 of the 2005 SPD, which provided as follows:

You instruct the Company how to invest your contributions by choosing from one or more of the following investment options designed to help you meet your savings time frame, financial objectives, and risk tolerance:

Money Market Fund: Merrill Lynch Government Fund;

Stable Value Fund: Merrill Lynch Retirement Preservation Trust;

Fixed Income Funds: Merrill Lynch Aggregate Bond Index Fund, Ariel Premier Bond Fund (Investor Class), Calvert Income Fund, PIMCO Total Return Fund;

the investment of all his or her Accounts except his or her Company Match and ESOP Accounts ... Each Participant ... shall be solely responsible for the selection of his or her Investment Fund choices. The fact that an Investment Fund is offered shall not be construed to be a recommendation for investment." Plan, § 7.3, p. 23 (TCCC–000029).

Employees are fully vested in all accounts at all times. Plan, § 8.1, p. 25 (TCCC–000031). Participants can move their investments from one choice-of-investment account to another at any time. Moving from Coke stock to another investment requires a market sale of the Coke stock. Participants who own Coke stock can vote their shares and receive dividends in cash or have the dividends reinvested in Coke stock.

Upon retirement, disability, or leaving the Company, participants are entitled to be paid distribution(s) from their choice-of-investment accounts in cash,[14] except that Coca–Cola stock may be distributed in specie at the participant's election.

### 2. *The ESOP Component*

Throughout the Class Period, the Plan contained a component whereby Coca–Cola matched a participant's contributions with a dollar-for-dollar contribution of its own. Originally named the "Company Match Account," this component qualified as an Employee Stock Ownership Plan ("ESOP") under ERISA in March, 2002.

Employees' ESOP accounts are invested in whole or fractional shares of Coca–Cola common stock in the Coca–Cola Stock Fund. Transactions involving these shares involve actual market sales or purchases. Participants can vote their shares and either receive dividends in cash or have dividends reinvested in Coca–Cola stock.

The ESOP does not allow participants to sell their Company-contributed Coca–Cola stock until age 53. Participants can then move the proceeds to other investments which are offered in the choice-of-investment component. Compl. ¶ 54. However, neither the stock nor its proceeds can be taken out of the Plan until retirement, disability or leaving the Company.

Employees hired after March 31, 2002 vest in their ESOP/Company Match accounts gradually over a three-year period. Employees hired before that were immediately fully vested in their ESOP/Company Match accounts.

Balanced Funds: Merrill Lynch Strategy Growth & Income Fund, Merrill Lynch Strategy Long–Term Growth Fund, Merrill Lynch Strategy All–Equity Fund;

Stock Funds ...: S & P 500 Stock Fund, Merrill Lynch Basic Value Fund, Inc., Pioneer Fund, AIM Blue Chip Fund, Davis New York Venture Fund, Inc., Dreyfus Premier Third Century Fund, Merrill Lynch Fundamental Growth Fund, Inc., Delaware Investments Trend Fund, PIMCO NFJ Small Cap Value Fund, Merrill Lynch Small Cap Index Fund, Merrill Lynch Value Opportunities Fund, Pioneer Small Company Fund;

International Stock Funds: Merrill Lynch International Index Fund, ING International Value Fund, Federated International Equity Fund, Thornburg International Value Fund, ING International Small Cap Fund;

The Coca–Cola Company Common Stock. Prior to the 2004 Plan, "Plan participants had a much narrower menu of potential investment options." Compl. paragraph 52. Appendix A of the 1997 Trust Agreement listed the following investment fund choices:

| | |
|---|---|
| Income Fund- | Stable Value |
| Equity Funds- | Company Stock |
| | S & P 500 Stock |
| Combination Fund- | Life Path Series. |

**14.** The cash can be paid in a lump sum, or in more than one payment.

### 3. Structure of the Plan and the Trust

Coca–Cola established predecessor versions of the Plan and the Trust well prior to the Class Period. The versions in effect during the Class Period are in the record either as attachments to Defendants' Motion to Dismiss or as an attachment to Plaintiff's Brief in Response to Defendants' Motion to Dismiss.

Coca–Cola is the Plan Sponsor. The Plan is executed only by Coca–Cola, acting through the Benefits Committee. Coca–Cola is the settlor of the Trust. At the beginning of the Class Period in 1997, Barclays Global Investors was the Trustee. At the end of the Class Period in 2005, Merrill Lynch Trust Company was the Trustee. While the Plan and the Trust are separately executed documents, both the Plan and the Trust state that the Trust "shall constitute part of the Plan." Preamble to Trust Agreement; Plan, § 1.63, 1.64. The Trust holds the assets of the Plan, which include participants' contributions and contributions by Coca–Cola.[15] The Trust's holdings are invested in various funds,[16] as directed by participants (except for the ESOP matching contributions which automatically are invested in Coca–Cola stock in the Coca–Cola Stock Fund.)[17] Upon specific direction by the Administrator of the Plan, the Trustee makes payments to participants, either in stock or in cash. The Trustee has no discretion in investing the Trust's funds or in making payments to Plan participants. The Trustee is not a party in this lawsuit.

### 4. Assets Management Committee and Benefits Committee

The Plan and the Trust both establish that the Assets Management Committee is responsible for selecting the various investments which will be available in the choice-of-investment components of the Plan. In exercising this discretion, the Committee acts as a fiduciary under the Plan. However, the Plan requires that Coca–Cola common stock be offered as one of the investment options in the choice-of-investment component[18] and also requires that Coca–Cola's matching contributions to the stock bonus plan be invested in Coca–Cola stock.[19] In these respects, the Assets Management Committee has no discretion.

Similarly, the designation of the Benefits Committee[20] as Administrator of the Plan is a matter of Plan design. The Plan

---

15. The Trustee is authorized to pay the Trust's expenses which have not already been paid by Coca–Cola out of the Trust's assets.

16. As of December 31, 2004 the Plan held 19,928,806 shares of Coke stock with a fair market value of $829,835,482. This was 60% of the Plan's total invested assets. In other years the percentage has been as high as 82%. Complaint ¶ 57. This probably means that Plan participants more recently have elected to invest less money in Coca–Cola stock in the choice-of-investment part of the Plan.

17. The Coca–Cola Stock Fund is a "custom fund" only for Plan participants which, pursuant to the Trust Agreement "...shall be comprised of company stock and sufficient deposit or money market type assets to handle the Fund's liquidity and disbursement needs." Trust Agreement, § 3.9. The Court notes that the Assets Management Committee may serve as the investment manager for the Stock Fund. Trust Agreement, § 3.6.

18. Trust Agreement, § 3.1. Section 3.2, which permits any of the investment funds to *include* Coca–Cola stock, has been misconstrued by Plaintiff.

19. Plan, § 7.3.

20. Formerly the Corporate Retirement Plan Administrative Committee.

states that this Committee has discretion to operate, manage, and administer the Plan, including but not limited to various specified duties. One of the duties is to:

(c) provide each Participant with plan summaries, notices and other information about the Plan as it considers necessary and in compliance with ERISA....

Plan, § 15.4(c).

ERISA spells out in detail the extensive information a pension plan administrator must provide to Plan participants, including: summary annual reports, summary plan descriptions, summaries of material modifications to the Plan, and statements of total accrued benefits and vested pension benefits. *See* 29 U.S.C. §§ 1021(a)(2), 1022, 1024(b)(1), 1024(b)(3), 1025(a). 1025(c). Regulations promulgated by the Department of Labor further refine these disclosure obligations. *See* 29 C.F.R. §§ 2520.104b–1—2520.104b–4, 2520.104b–10.

The Trust Agreement provides that the Trust may be amended by written agreement of the Trustee and the Assets Management Committee. It may be terminated at any time by Coca–Cola, acting through the Assets Management Committee. The Plan provides that it may be terminated or amended at any time by Coca–Cola, acting through the Benefits Committee.

E. *Count I: Claim that all Defendants Failed to Prudently and Loyally Manage the Plan's Assets*

Count I alleges that all Defendants breached their fiduciary duty under ERISA to "prudently and loyally manage" the Plan's assets. Plaintiff alleges that Defendants acted imprudently by "fail[ing] to take any action to protect participants from losses as a result of the Plan's invest-

ment in Coke stock." Plaintiff states that in light of Coca–Cola's "improper practices...investment in Coke stock during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement." Compl. at ¶¶ 151–52.

■ As an initial matter, Count I cannot survive as against the Benefits Committee and its members. The Trust Agreement and the Plan make clear that the Benefits Committee has no prerogatives regarding selection of the Plan's investments. The Benefits Committee is the "Administrator of the Plan, responsible for administering the Plan *other than with regard to the Plan's investment matters"*. Trust Agreement, § 1.3 (TCC–000493) (emphasis added). Therefore, the Benefits Committee was not a fiduciary with respect to investment decisions and cannot be sued for breach of fiduciary duty in that regard.

Nor can Count I survive against the Vice President Defendants because they were not fiduciaries with respect to investment decisions either. They had the right to appoint and remove members of the Benefits Committee, but since the members of the Committee made no investment decisions, the Vice–President Defendants cannot be faulted for appointing them or for failing to remove them for bad investment decisions.

■ The Assets Management Committee is the named fiduciary for making investment decisions for the Plan. During the Class Period this Committee did in fact make changes in the investment options available to participants, broadening the number of choices. In this respect the Committee did exercise its fiduciary responsibility. With respect to the Coca–Cola stock offered in the ESOP and in the choice-of-investment component, however,

no exercise of fiduciary duty was implicated. The Plan specifically required that only Coca–Cola stock be supplied in the ESOP, and required that Coca–Cola stock be offered as one of the choice-of-investment options. Plaintiff's argument, therefore, is necessarily that the Assets Management Committee is liable to her and other Plan participants either (1) for not ignoring the Plan provisions which called for giving Coca–Cola stock in the ESOP (as opposed to some other stock or cash), (2) for offering a range of investment choices in the choice-of-investment component which included Coca–Cola stock, (3) for allowing the Coke Stock Fund to hold only Coke stock, (4) or (perhaps) for keeping participants from "cashing out" Coke stock in the ESOP before age 53.

ERISA enumerates the duties required of Plan fiduciaries. One duty is to follow the provisions of the plan documents, "insofar as such documents and instruments are consistent with the provisions of this subchapter ['Protection of Employee Benefits Rights'] and subchapter III of this chapter ['Plan Termination Insurance']." 29 U.S.C. § 1104(a)(1)(D). Plaintiff does not contend that the Plan is facially inconsistent with ERISA's requirements. While ERISA generally provides that a fiduciary must diversify the investment of a plan, it also excuses that duty in the case of a fiduciary of an EIAP. *Id.* at § 1104(a)(2). Further, the duty of prudence is excused to the extent that it depends on diversification. *Id.* Therefore, under ERISA's express provisions, the fact that the Plan was heavily invested in Coca–Cola stock does not itself show that the fiduciaries were negligent or abused their discretion. It is also common sense that the mere fact of a drop in stock price does not show that a particular stock is an imprudent investment.

Plaintiff's theory is that the Assets Management Committee should have disregarded the Plan's provisions. Her theory is based on *Moench v. Robertson,* 62 F.3d 553 (3d Cir.1995), in which the United States Court of Appeals for the Third Circuit held that ERISA creates a presumption that an ESOP's investment in employer stock is prudent; however, a plaintiff may overcome that presumption with facts showing that the fiduciary abused its discretion in failing to choose a different investment in a particular situation. Applying the formula, the Third Circuit found that a precipitous drop in the employer's stock price, the impending collapse of the employer company, and the conflicted status of the fiduciaries required that the plan fiduciaries sell off the company stock in the ESOP and substitute cash or another investment, even though the plan called for investment primarily in employer stock. In failing to do that, the Court held that the fiduciaries had abused their discretion. The Court also reasoned that because the company was on the brink of collapse, the purpose of the plan (strengthening the ties between the company and its employees) had failed; therefore, the plan provisions were not binding. The United States Court of Appeals for the Eleventh Circuit has not ruled on whether to adopt *Moench's* formula.

*Moench's* presumption/abuse of discretion formula has been applied by the United States Court of Appeals for the Sixth Circuit in *Kuper v. Iovenko,* 66 F.3d 1447 (6th Cir.1995) (plan prohibition against diversification not binding under ERISA but no abuse of discretion for failure to liquidate company stock held in an ESOP) and by the United States Court of Appeals for the Seventh Circuit in *Steinman v. Hicks,* 352 F.3d 1101 (7th Cir.2003) (no abuse of discretion for failing to diversify holdings

of an ESOP plan pending a trust-to-trust transfer).

The United States Court of Appeals for the Ninth Circuit discussed, but ultimately decided not to apply, the *Moench* presumption/abuse of discretion formula in *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097–98 (9th Cir.2004). The Ninth Circuit articulated a concern that *Moench* contravened Congress's intent expressed in ERISA. Ultimately, it declined to decide "whether the duty to diversify survives the statutory text of [29 U.S.C. § 1104(a) ]." *Id.* However, the *Wright* court also stated that even if it had applied *Moench,* there is no abuse of discretion by an ERISA fiduciary who failed to sell stock in an ESOP in contravention of the plan when plaintiffs made no allegation that the company was on the brink of collapse. *Id.* at 1098–99. A significant drop in stock price is not enough to prove abuse of discretion; something more is required. *Id.*

Among the Circuit Courts, only the United States Court of Appeals for the First Circuit has applied the *Moench* presumption/abuse of discretion formula and held that something akin to an imminent collapse of the company is *not* required to show an abuse of discretion under *Moench.* In *LaLonde v. Textron,* 369 F.3d 1 (2004), the First Circuit held that a precipitous drop in the price of an employer's stock plus concealment of adverse information from shareholders was sufficient to show an abuse of discretion under *Moench.*

Various district courts have ruled both ways on the issue of what is required to overcome the *Moench* presumption, assuming that it applies. *See Hill v. Bell-South Corp.,* 313 F.Supp.2d 1361 (N.D.Ga.2004)(alleged overstatement of profits, investment in risky Latin Ameri-

can ventures enough to overcome *Moench* presumption on a motion to dismiss), *In Re Mutual Funds Investment Litig.*, 437 F.Supp.2d 449 (D.Md.2006) (not necessary to plead dire circumstances or imminent collapse to rebut *Moench* presumption), *In Re Sprint Corp. ERISA Litig.*, 443 F.Supp.2d 1249 (D.Kan.2006) (allegation of impending collapse not required), *In Re Syncor ERISA Litig.*, 351 F.Supp.2d 970 (C.D.Cal.2004) (allegation of serious mismanagement resulting in stock price drop overcomes *Moench* presumption); *but see and cf. Duke Energy ERISA Litig.*, 281 F.Supp.2d 786 (W.D.N.C.2003) (complaint not viable where dire circumstances or impending collapse not alleged); *In re McKesson HBOC, Inc. Erisa Litig.*, 391 F.Supp.2d 812 (C.D.Cal.2005) (allegations of inequitable conduct without brink of collapse insufficient to withstand motion to dismiss); *In re Calpine Corp. ERISA Litig.*, No. 03–1685, 2005 WL 1431506 (N.D.Cal. Mar. 31, 2005) (allegation of seriously deteriorating financial condition and genuine risk of inside self-dealing required to state claim); *In re Reliant Energy Erisa Litig.*, No. Civ. A. H–02–2051, 2006 WL 148898 (S.D.Tex. Jan. 18, 2006) (where plan required that employer stock be offered as one investment option and that matching funds be invested in employer stock, fiduciary had no discretion to do otherwise and complaint subject to dismissal notwithstanding allegation of nonpublic information which artificially inflated value of employer stock).

In the absence of controlling authority in the Eleventh Circuit, the undersigned finds *Wright, Duke Energy, McKesson* and *Reliant* more persuasive than cases taking the contrary view. *Moench* may run afoul of ERISA's express provisions. Further, the presumption/abuse of discretion formula it establishes is too broad if it is applied

outside the situation where the employer is on the brink of collapse and the employees are not able to sell their stock in the plan. If any combination of factors potentially can overcome *Moench*'s presumption, ERISA fiduciaries are left with no meaningful guidance as to when they should, or should not, ignore an ERISA plan's requirement to offer company stock. A fiduciary who decides to scrap the ESOP is just as apt to be sued as he would be if he enforced the plan provisions. This uncertainty fosters expensive, speculative litigation. It could also cause employers to be hesitant to offer the benefits of an ESOP to its employees. Furthermore this case, like *Reliant*, presents a situation where the fiduciary (the Assets Management Committee) has no discretion as to investing in Coca–Cola stock where (a) the plan participant directed it or (b) the stock was purchased with Coca–Cola's matching contribution.[21]

Finally, assuming that the Court should apply the *Moench* formula, the undersigned would still rule that Plaintiff has not alleged sufficient facts to overcome *Moench*'s presumption of prudence. Taking as true all of Plaintiff's allegations regarding the gallon-pushing strategy, the downturns in Russia and India, the Burger King debacle, and the contaminated vending machines, and accepting that the Company's stock declined from $66.50 to $40.97 a share during the Class Period, that would not be enough to justify a decision by the Assets Management Committee to discontinue matching employee contributions with Coke stock, delete Coke stock from the optional investment choices, or to sell off Coke stock in the Coca–Cola Stock Fund in the face of the contrary provisions of the Plan and the Trust. The drastic action Plaintiff advocates would only be appropriate in the case of a company on the brink of collapse, where employee participants in the plan have no further incentive to participate. As Defendants have pointed out, Coca–Cola was a financially robust company with substantial net revenues throughout the Class Period.[22]

Because Count I is not viable against the Assets Management Committee, it follows that it is not viable against the CEO Defendants who appointed them. Because there is no primary breach of fiduciary duty, Coca–Cola cannot be liable either. Count I is DISMISSED.

### F. Count II: Claim that Coca–Cola and the Officer Defendants Failed to Monitor Committee Defendants & Provide them with Information

Count II of the complaint alleges that Coca–Cola and the Officer Defendants are liable to Plaintiff for breach of their fiduciary duty to monitor the Committee Defendants (the Assets Management Committee members and the Benefits Committee members)[23]. Under the Plan the Assets Management Committee members are

---

21. Part of *Moench*'s rationale was that the fiduciary had *some* discretion to swap employer stock for other investments. That is not the situation in this case.

22. During the Class Period Coca–Cola's net revenues ranged between $2.1 billion to $4.8 billion per year. Dividends increased from $.56 per share in 1997 to $1.00 per share in 2004. Defendants' Exhibits 3–10.

23. Specifically, Count II of the complaint alleges the following:

> 164. Coke and the Officer Defendants breached their duty to monitor because they knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering the Coke stock fund as an investment alternative for the Plan, and (ii) continuing to invest the assets

appointed by and serve at the pleasure of the CEO, identified collectively in the complaint as the "CEO Defendants." The members of the Benefits Committee are appointed by and serve at the pleasure of the Vice President—Human Resources, identified collectively in the complaint as the "Vice President Defendants."

Defendants do not dispute that the power to appoint and remove a fiduciary is itself a fiduciary function under ERISA, but they point out that under a regulation promulgated pursuant to ERISA, the monitoring obligation is narrowly defined and that this definition has been recognized in a number of ERISA cases. Defendants also dispute Plaintiff's claim that the duty to monitor includes a duty by the appointing parties to keep appointees informed of nonpublic information. Most fundamentally, they point out that since Plaintiff's claim that investment in employer stock was imprudent fails as a matter of law, there can be no viable cause of action for

failing to monitor the committee members who were charged with responsibility for investment decisions.

ERISA does not itself mention an appointing official's duty to monitor fiduciary appointees. The referenced regulation is the following:

> At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to insure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

29 C.F.R. § 2509.75–8 at FR–17. A number of cases have held that the duty to monitor under ERISA is congruent with that stated in the regulation. *E.g., Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1466 n. 10 (4th Cir.1996); *see also Leigh v. Engle,* 727 F.2d 113, 135 (7th Cir.1984); *In*

of the Coke stock fund in Coke stock when it no longer was prudent to do so. Despite this knowledge, neither Coke nor the Officer Defendants took action to protect the Plan and its participants from the consequences of these fiduciaries' failures.

165. In the alternative, Coke and the Officer Defendants, failed to disclose to the Committee Defendants accurate information about the financial condition of Coke that the Committees needed to perform their fiduciary duties. By remaining silent and continuing to conceal such information from the other fiduciaries, the Coke and the Officer Defendants breached their monitoring duties under the Plan and ERISA.

166. Coke and the Officer Defendants failed to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.

167. Coke and the Officer Defendants are liable as co-fiduciaries because they knowingly participated in each other's and the Committee Defendants' fiduciary breaches, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

168. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, not only lost a significant portion of Class members' retirement savings, but also failed to achieve the gains that the Plan, and indirectly the Class, would have realized had Defendants performed their fiduciary duties.

169. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore to the Plan the injury caused by their breaches of fiduciary duties alleged in this Count.

re Elec. Data Sys. Corp. ERISA Litig., 305 F.Supp.2d 658, 671 (E.D.Tex.2004); *In re Calpine Corp. ERISA Litig.*, No. 03–1685, 2005 WL 1431506, at *4–5 (N.D.Cal. Mar. 31, 2005); *Schrader v. Trucking Employees of N. Jersey Welfare Fund*, 232 F.Supp.2d 560, 569 (M.D.N.C.2002); *In Re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation*, 312 F.Supp.2d 1165 (D.Minn.2004).

In addition to reiterating that the investments made by the Assets Management Committee were imprudent (and that the CEO Defendants are responsible for those decisions), Plaintiff argues that she has pled enough to set forth a claim for breach of the duty to monitor, and also that case authority supports her claim that a duty to monitor includes a duty on the part of appointing officials to keep appointees informed of "material nonpublic information." *See, e.g., Woods*, 396 F.Supp.2d 1351, at 1373–74 (N.D.Ga.2005); *In re Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 477 (S.D.N.Y.2005); *In re Syncor ERISA Litig.*, 351 F.Supp.2d 970, 986 (C.D.Cal. 2004); *In re Sears, Roebuck & Co. ERISA Litig.*, Civ. No. 02–22–2–JWL, 2004 U.S. Dist. LEXIS 3241, at *23 (N.D.Ill. March 2, 2004); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F.Supp.2d 511, 657 (S.D.Tex.2003); *In re WorldCom, Inc.*, 263 F.Supp.2d 745, 765 (S.D.N.Y.2003).

The Court does not need to determine the scope of the monitoring duty, or whether such a duty includes a duty to inform in order to rule on the motion to dismiss Count II. The Court has found that there was no breach of fiduciary duty on the part of the Assets Management Committee in offering Coke stock in the Plan. The Benefits Committee had no role in determining investment choices. This precludes Plaintiff's claim that the Officer Defendants failed to monitor the Committee Defendants properly, thereby causing the Plan to be overinvested in Coke stock. Furthermore, the duty to monitor, as it has been interpreted by other district courts, is not breached without the monitoring party having "notice of possible misadventure by [the] appointees." *Newton v. Van Otterloo*, 756 F.Supp. 1121, 1132 (N.D.Ind.1991); *see also Dynegy*, 309 F.Supp.2d 861, 904 (S.D.Tex.2004). Plaintiff has not alleged that the Officer Defendants had notice of any appointee conduct that would warrant removal. Because no primary breach of a monitoring duty has been set forth, liability on Coca–Cola's part is precluded also.

Accordingly, the Court GRANTS Defendants' motion to dismiss Count II.

G. *Count III: Claim that the Benefits Committee and Coca–Cola Failed to Provide Complete and Accurate Information to Plan Participants and Beneficiaries*

■ Plaintiff alleges that Coca–Cola made SEC filings together with related Company announcements and releases that omitted material facts and were misleading because they failed to reveal the gallon-pushing strategy while it was in effect and failed to accurately report the facts surrounding the cessation of the strategy. Plaintiff may also be contending that the filings were misleading because Coca–Cola did not report timely writeoffs for assets in India and Russia. The SEC filings were incorporated by reference into the Plan documents. Plaintiff argues that the creation of the SEC filings was a fiduciary act that imposes liability on Coca–Cola under ERISA. Defendants argue that Coca–Cola was not acting as a Plan fiduciary when it created the SEC filings which contain the misleading information.

Defendants are correct that an employer may sometimes act in a non-fiduciary capacity, and is only subject to claims for breach of fiduciary duties when the employer acts in a fiduciary capacity. The threshold question for any claim of breach of fiduciary duty is "whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

In the instant case, Coca–Cola's act in question was the creation of allegedly misleading SEC filings which would be disseminated to shareholders, some of whom are Plan participants. Creating SEC filings is not governed by ERISA because it does not "involve discretionary acts regarding plan administration." *Sutton v. BellSouth Telecomms., Inc.,* 189 F.3d 1318, 1321 (11th Cir.1999); *Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc.,* 828 F.2d 710, 713–14 (11th Cir. 1987) ("One assumes fiduciary status only when and to the extent that they function in their capacity as health plan fiduciaries,

not when they conduct business that is not regulated by ERISA"). "Those who prepare and sign SEC filings do not become ERISA fiduciaries through those acts, and consequently, do not violate ERISA, if the filings contain misrepresentations." *WorldCom,* 263 F.Supp.2d at 766. SEC filings are made for the purpose of complying with the federal securities laws. The creation of SEC filings is not regulated by ERISA, and in creating the filings, Coca–Cola was not acting as a fiduciary of the Plan.[24]

Unlike Coca–Cola, the Benefits Committee did exercise its discretion in deciding to refer to the SEC filings in the Plan documents that would be made available to Plan participants. Including the SEC filings in the plan documentation apparently was a fiduciary act on the part of the Benefits Committee because the Benefits Committee was charged with the responsibility for communicating with participants about the Plan.[25]

Defendants respond that the Company's SEC filings and press releases, "which do not reference the Plan or benefits in any

---

**24.** Of course, Coca–Cola is fully responsible for material omissions and misleading statements in SEC filings under the federal securities laws. Because Coca–Cola's plan participants are all shareholders, any aggrieved participant may seek redress under these laws. Indeed, a consolidated class action under the federal securities laws based in part on the same allegations of corporate mismanagement and impropriety (gallon-pushing, failure to properly reveal gallon-pushing strategy, allegedly delayed writedowns of assets in India and Russia) is pending in this Court. *See Carpenters Health & Welfare Fund of Philadelphia & Vicinity v. The Coca–Cola Co., et al.,* Civil Action No. 1:00–cv–2838–WBH, filed Oct. 27, 2000.

**25.** Plaintiff may have failed to plead a breach of fiduciary duty with respect to the SEC filings. Although Plaintiff has alleged that the

Benefits Committee incorporated misleading SEC filings in the Plan documents, the complaint contains no clear allegations that the Benefits Committee members knew or should have known that the referenced SEC filings omitted any material facts or that they were misleading.

A fiduciary's duty to inform, if such a duty exists, extends only as far as the fiduciary's knowledge. *See Eddy v. Colonial Life Ins. Co. of Am.,* 919 F.2d 747, 751 (D.C.Cir.1990) (a fiduciary is "under a duty to communicate all the material facts ... which the [fiduciary] knows or should know."); *see also Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.,* 93 F.3d 1171, 1181–82 (3d Cir.1996) ( [it is] "the knowledge of the fiduciary" which "may give rise to ... a duty to disclose").

way", Def.'s Brief in Support of Motion to Dismiss, p. 30, do not "relate to the Plan" and were not "made in the context of a discussion of benefits"; therefore, they are not actionable under ERISA. *See Varity Corp. v. Howe,* 516 U.S. 489, 504, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Defendants argue that "Plaintiff has not even attempted to articulate a connection between the SEC filings at issue and the Plan. Indeed, the only connection at all appears to be that the SEC filings relate to the Company, and the Plan holds Company stock. This is clearly not a sufficient connection to satisfy the *Varity* requirement." Defendants' Reply Brief, p. 24. Plaintiff responds that where false statements in SEC filings are incorporated into Plan documents, the statements are actionable under ERISA. *See, e.g., In re Sprint Corp. ERISA Litigation,* 388 F.Supp.2d 1207, 1226–27 (D.Kan.2004); *In re JDS Uniphase Corp. ERISA Litig.,* No. C 03–04743, 2005 WL 1662131 at *12 (N.D.Cal. July 14, 2005); *In re Dynegy, Inc. ERISA Litig.,* 309 F.Supp.2d at 862, 879; *In re AEP ERISA Litig.,* 327 F.Supp.2d 812, 825 (S.D.Ohio 2004).

Defendants further argue that ERISA is a complete statutory scheme which details the disclosures which must be made to Plan participants, and that this list should not be enlarged to include disclosures which must be made under the federal securities laws. Required ERISA disclosures, which are set forth in 29 U.S.C. §§ 1021–31; 29 C.F.R. §§ 2520.101–2520.107–1 (promulgated on scattered dates) include such items as the summary plan description and an annual report for the ERISA plan, including a financial statement. Defendants point out that four Courts of Appeals have expressly refused to expand ERISA's disclosure requirements with additional disclosure obligations. *E.g., Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 658 (4th Cir.1996); *Baker v. Kingsley,* 387 F.3d 649, 662 (7th Cir. 2004); *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 405 (6th Cir.1998) (en banc); *Trs. of CWA/ITU Negotiated Pension Plan v. Weinstein,* 107 F.3d 139, 147 (2d Cir.1997). No Court of Appeals has recognized an ERISA duty to make disclosures beyond ERISA's detailed disclosure requirements.

Some district courts have issued opinions agreeing with Defendants' position. *See, e.g., McKesson,* 391 F.Supp.2d at 836–37; *Calpine,* 2005 WL 1431506, at *7; *In re Tyco Intern., Ltd. Multidistrict Litigation,* No. MDL 02–1335–PB, 02–1357–PB, 2004 WL 2903889, *6 (D.N.H. Dec. 2, 2004); *Pa. Fed'n v. Norfolk S. Corp. Thoroughbred Ret. Inv. Plan of the Norfolk S. Corp.,* No. 02–9049, 2004 WL 228685, at *5–6 (E.D.Pa. Feb. 4, 2004); *Crowley v. Corning, Inc.,* 234 F.Supp.2d 222, 226 (W.D.N.Y.2002); *Stein v. Smith,* 270 F.Supp.2d 157, 172–73 (D.Mass.2003). However, there are other district court opinions supporting Plaintiff's side of this argument. *See, e.g., Kling v. Fid. Mgmt. Trust Co.,* 323 F.Supp.2d 132, 143 n. 10 (D.Mass.2004); *In re CMS Energy ERISA Litig.,* 312 F.Supp.2d 898, 914–15 (E.D.Mich.2004); *Xcel,* 312 F.Supp.2d at 1181–82; *In re Elec. Data Sys. Corp. ERISA Litig.,* 305 F.Supp.2d 658, 673 (E.D.Tex.2004); *Rankin v. Rots,* 278 F.Supp.2d 853, 874–78 (E.D.Mich.2003); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 565–66 (S.D.Tex.2003); *WorldCom,* 263 F.Supp.2d at 766–67.

While the Court is inclined to accept Defendants' argument that ERISA itself does not require any disclosures beyond those expressly required by ERISA, a rul-

ing in Defendants' favor on this point would not be dispositive, because the SEC filings were incorporated by reference into the SPDs. It is undoubtedly generally true that a company's SEC filings are intended to address the financial status of the company, and a company's ERISA filings are calculated to address information pertaining to the company's ERISA plan (as opposed to the company's finances). However, the Court is not willing to resolve the question whether any of Coca–Cola's SEC filings, which may have been reviewed by Plan participants, provided information "about the Plan" or "in the context of plan benefits" which was misleading without reviewing the relevant SEC filings and any attendant announcements and press releases. For this reason, Defendants' motion to dismiss Count III is DENIED as to the Benefits Committee members.

In a recent decision of the United States Court of Appeals for the Eleventh Circuit, *Wagner v. First Horizon Pharma. Corp.*, 464 F.3d 1273 (11th Cir.2006), the Court remanded a securities case to the district court where "the complaint is so deficient that the Court should have *sua sponte* ordered repleading." This case, of course, is not a securities case, but it does share certain attributes with the criticized complaint in the *Wagner* case. Plaintiff's complaint here is a "shotgun" complaint (215 paragraphs) and it employs the approach of incorporating into each count of the complaint all previous allegations of the complaint, a practice condemned by *Wagner*. In addition, Count III simply does not have the level of specificity which is appropriate at this point, particularly given that the very matters covered by Count III in all likelihood have been the subject of discovery in the companion securities case which has been pending since 2000. As best the Court can tell, the gist of

Count III is that the SEC filings covering the time frame from 1997 to January 1, 2000 failed to reveal certain nonpublic information including gallon-pushing, the true facts concerning the cessation of gallon-pushing, and the allegedly overdue writeoffs for assets in Russia and India. These filings were incorporated by reference into summary plan descriptions, and allegedly were misleading to shareholders who were also Plan participants. The Court expects a repleaded Count III to detail exactly what SEC filings, announcements and press releases were misleading, in what respects they were misleading, and in what respect they pertained to the Plan or benefits under the Plan. Similarly, Plaintiff shall identify any communications disseminated to Plan participants (for example, summary plan descriptions, annual reports for the Plan, financial or actuarial statements for the Plan, other communications to participants) which were misleading and indicate in what respect they were misleading.

Finally, paragraphs 188 and 189 within Count III are especially egregious in their failure to satisfy even the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. These paragraphs allege that Coca–Cola and the Benefits Committee members are liable as co-fiduciaries with other unnamed fiduciaries. Paragraph 189 further asserts that a Plan participant "is presumed as a matter of law to have relied on such misrepresentations and omissions to his or her detriment" without setting forth what misrepresentations and omissions are involved. Plaintiff is directed to replead these paragraphs with specificity.

In summary, Defendants' motion to dismiss Count III is granted as to Coca–Cola, but DENIED as to members of the Bene-

fits Committee. Plaintiff is directed to replead Count III insofar as it pertains to the Benefits Committee, with specificity, within twenty (20) days.

H. *Count IV: Claim that Coca–Cola and the Officer Defendants Breached a Duty to Avoid Conflicts of Interest*

█ Plaintiff alleges that during the Class Period, "a significant percentage of the compensation of Coke's CEO and officers was in the form of stock grants or stock option grants." Compl. at ¶ 196. Plaintiff claims that this gave the Officer Defendants an incentive to keep the Plan's assets invested in Coke stock, so as to protect its price in the market. According to Plaintiff, this conflict of interest "put Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the plan participants and beneficiaries." Compl. At ¶ 199. Plaintiff alleges that the Officer Defendants acted in their own interests, by failing to engage independent fiduciaries and failing to take steps to ensure that participants' interests were loyally and prudently served.

ERISA sets forth a fiduciary duty of loyalty whereby fiduciaries of an ERISA plan are to avoid any conflicts of interest with their duty to act "solely in the interest of the participants and the beneficiaries" of an ERISA Plan. 29 U.S.C. § 1104(a)(2000).

The Officer Defendants were not named fiduciaries of the Plan. Beyond appointing and removing the members of the Committees they had no fiduciary duties. The Court has found that the members of the Assets Management Committee did not breach their fiduciary duty regarding investment choices. The Benefits Committee had nothing to do with investment choices. Plaintiff has not alleged that the Officer Defendants were influenced to appoint or remove anyone from the Committees because of their alleged conflict of interest. Count IV of the Complaint fails to state a claim for which relief can be granted. Accordingly, it is DISMISSED.

### CONCLUSION

Defendants' Motion to Dismiss [Doc. # 32] is GRANTED IN PART. Counts I, II, the claim against Coca–Cola under Count III, and Count IV are DISMISSED. Plaintiff is directed to replead Count III's claim against the members of the Benefits Committee with specificity within twenty (20) days of the date of entry of this Order.