[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-13002
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 8, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:07-cv-00197-ODE

RAYMOND A. LANFEAR
RANDALL W. CLARK,
ANTONIO FIERROS,

Plaintiffs - Appellants,

TERRY CLARK,
et al.,

Plaintiffs,

versus

HOME DEPOT, INC.,
ROBERT L. NARDELLI,
JOHN I. CLENDENIN,
MILLEDGE A. HART, III,
KENNETH G. LANGONE, et al.,

Defendants - Appellees,

LARRY M. MERCER, et al.,

Defendant.

Appeal from the United States District Court
for the Northern District of Georgia

(May 8, 2012)


Before TJOFLAT, CARNES, and ANDERSON, Circuit Judges.

CARNES, Circuit Judge:

People build many things over the course of their lives. Throughout the time allotted them, they build houses and homes, character and careers, relationships and reputations. And if they're wise like Aesop's ant, during the summer and autumn of their lives they store up something for the winter.[1] Although the ant in the fable did well enough without its savings plan being protected by ERISA, the plaintiffs in this case seek the protections of that statute. They claim that the fiduciaries of their retirement plan violated ERISA in ways that damaged their efforts to stockpile savings for their winter years.

The plaintiffs planned for their retirement by investing in a single retirement plan that is both an "eligible individual account plan" ("EIAP") and an "employee

---

[1] See Aesop, "The Ant and the Grasshopper," in Aesop's Fables Together with the Life of Aesop 115 (Rand McNally 1897).

stock ownership plan" ("ESOP"). Their employer, The Home Depot, Inc., offered that retirement plan as an employee benefit. The plaintiffs claim that the fiduciaries of the Plan, who are the defendants in this case,[2] breached their fiduciary responsibilities under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. The complaint, as last amended, alleges that the defendants: (1) continued to purchase and failed to sell Home Depot stock even though they knew based on nonpublic information that the stock price probably was inflated; (2) provided inaccurate information to the Plan participants in fiduciary communications; and (3) did not disclose to the Plan participants certain Home Depot business practices that had inflated Home Depot's stock price. The plaintiffs argue that those alleged breaches of the defendants' fiduciary duties, which ERISA imposes, diminished their retirement funds. One of Home Depot's advertising slogans was: "You Can Do It. We Can Help."[3] From the plaintiffs' perspective, when it came to overseeing their retirement plans, a more accurate slogan for the company would have been: "You Can't Do It Because We Won't

_____

[2] The defendants are The Home Depot, Inc., Home Depot's board of directors, two committees that oversaw the administration and investments of the Plan, and various Home Depot directors and officers.

[3] See Rachel Tobin Ramos, Home Depot Shifts Strategy to Push Bargain: New Ads Focus on Value, Chain's No-frills Style, Atlanta J. Const., Mar. 24, 2009, http://www.agc.com/services/content/printedition/2009/03/24/homedepot0324.html.

Help."

I.

A.

Like many other companies, Home Depot provides some of its employees with retirement benefits.[4] It does so by sponsoring the Home Depot FutureBuilder Plan ("the Plan"), which is both an EIAP and an ESOP. Both of those types of plans are governed by ERISA. See 29 U.S.C. § 1107(d)(3), (d)(6). Home Depot's Plan is a "defined contribution plan," with accounts for each participant and with benefits based solely on the amount contributed to the participant's individual account by the participant and Home Depot. See id. § 1002(34). The Plan's assets are invested in a trust, which is managed by a trustee who is responsible for investing the trust's assets according to the Plan's terms and the participants' directions. The Trustee is subject to the directions of Home Depot, an Investment

---

[4] Because this is an appeal from a Federal Rule of Civil Procedure 12(b)(6) dismissal, we draw the facts from the allegations in the complaint, which we accept as true and construe in the light most favorable to the plaintiffs. See Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011).

Committee,[5] and an Administrative Committee.[6]  Both the Investment and

Administrative Committees, and their members, are fiduciaries of the Plan.  See id.

§ 1102(a)(2).

The Plan allows for three types of contributions to a participant's account:

(1) voluntary, pre-tax contributions by the participant from his pay; (2) company

matching contributions equal to a certain percentage of the participant's

contributions; and (3) direct company contributions, which are not matching funds

and which are made solely at the discretion of Home Depot's board of directors.

A participant chooses how the amount in his individual account will be allocated

among eight different investment funds, which vary in risk and potential reward.

The language of the Plan requires that one of the available investment funds

be a "Company Stock Fund."  The "Company Stock Fund" is "the Investment

Fund invested primarily in shares of [Home Depot] stock."  The Plan requires that

all direct company contributions be invested initially in the "Company Stock

---

[5] The Investment Committee is responsible for, among other things, ensuring that the Plan's assets are invested for the exclusive purpose of providing benefits to the participants, defraying reasonable expenses of administering the Plan, and employing people to advise it about its responsibilities and duties.  The committee may also provide the trustee with investment policy guidelines and direction about investments made under the Plan's terms.

[6] The Administrative Committee is responsible for construing and answering questions about the Plan, deciding eligibility issues, resolving claims for benefits, and preparing and furnishing to participants and others all reports and information required by law.  It may also direct the trustee on matters of trust administration.

Fund," but voluntary contributions by Plan participants and company matching funds may also be invested in that fund. One of the eight investment funds, the "Home Depot, Inc. Common Stock Fund," qualifies as the "Company Stock Fund" under the Plan, and it is the fund at issue in this case. The Summary Plan Description states that "[t]he objective of [the Common Stock Fund] is to allow participants to share in ownership of [Home Depot]." The Plan description contains disclosures about the risk of investment and includes a graph reflecting the relative risks of the different funds, which shows that the Common Stock Fund is the riskiest one. The Plan description also provides: "Since [the Common Stock Fund] invests in only one stock, this fund is subject to greater risk than other funds in the plan."[7] Although Home Depot matching and direct contributions are initially invested in the Common Stock Fund, the participants may thereafter transfer them to a different fund.

B.

The plaintiffs allege that Home Depot stock became an imprudent investment when, unknown to the public, some officials and employees of the

---

[7] The Plan itself requires only that the Company Stock Fund be invested primarily in Home Depot stock, but it appears that the practice of the Plan fiduciaries was to invest the Common Stock Fund exclusively in Home Depot stock. No issue is made of that difference in this case.

company engaged in misconduct that inflated the company's stock price. Home Depot had agreements with its vendors to allow return-to-vendor chargebacks, which gave the company account credits for defective merchandise. Sometimes vendors permitted Home Depot stores to destroy defective merchandise instead of returning it.[8] The stores would then make an accounting adjustment to their "cost of goods sold" in an amount that offset the original cost of the item.

Some Home Depot stores, however, improperly used return-to-vendor chargebacks. They charged back to vendors not only defective merchandise but also merchandise that had been used or damaged in the stores or that had been stolen from them. All of these losses should have been borne by Home Depot, not by the vendors. Worse, some stores also processed return-to-vendor chargebacks for merchandise that was still in inventory and then sold that same merchandise to customers. These fraudulent return-to-vendor chargebacks inflated Home Depot's earnings and profit margins. The plaintiffs allege that the widespread use of return-to-vendor chargebacks to improperly improve Home Depot's bottom line began after a Home Depot executive issued a memorandum in April 2002 discussing "missed [return-to-vendor] dollars" and pinpointing departments with

_____

[8] Whether Home Depot was permitted to destroy a defective item or was required to return it to the vendor usually depended on its value.

the best opportunity to "boost chargebacks."[9]  See Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1243 (11th Cir. 2008).  The plaintiffs allege that the defendants were aware of the illicit return-to-vendor chargebacks as early as July 2002.

In October 2004 Home Depot stopped improperly processing return-to-vendor chargebacks, which immediately hurt its bottom line.  The fourth quarter of 2004 was the first time in ten quarters that Home Depot did not exceed analysts' earnings-per-share expectations, and its revenue and earnings growth fell short of historical levels.  The effect on its stock was predictable.  On February 18, 2005, the last trading day before Home Depot announced its fourth quarter 2004 results, the company's stock price closed at $42.02 per share; on the day the company announced those results, the stock price fell, closing at $40.28.  And it kept falling.  By the close of trading on April 28, 2005, the stock was trading at $35.09 per share.

The inflation of Home Depot's earnings through improper return-to-vendor chargebacks also led some of the defendants to make a number of inaccurate

---

[9] The improper use of return-to-vendor chargebacks by Home Depot stores eventually led to a series of articles in the New York Post exposing the practice, a Sarbanes-Oxley whistleblower complaint, an SEC inquiry, and a securities fraud class action brought by investors in Home Depot stock.  See Mizzaro v. Home Depot, Inc., 544 F.3d 1230 (11th Cir. 2008).  In Mizzaro, we concluded that the class complaint failed under the Private Securities Litigation Reform Act because it did not allege sufficient facts to support a strong inference that the named corporate officer defendants acted with the required scienter.  See id. at 1236–37, 1247.

statements and material omissions in filings with the Securities and Exchange Commission. From the first quarter of 2001 to the third quarter of 2004, Home Depot filed Form 10-Qs and Form 10-Ks[10] reflecting the improperly lower costs and higher profits that resulted from the illicit return-to-vendor chargebacks. During that same period, Home Depot also filed with the SEC Form S-8 registration statements[11] for the Plan, and it sent to Plan participants stock prospectuses, all of which incorporated by reference those faulty Form 10-Q and Form 10-K filings.

Then in June 2006 Home Depot announced that its top executives had backdated their stock option grants "in at least five instances" before December 2001. Stock option holders had been allowed to change the date of stock options to earlier dates and exercise them at the advantageous, lower market prices that had existed on those earlier occasions, instead of exercising them at the market price on the date the options were actually issued. Home Depot did not properly

[10] "Publicly traded corporations must file the Form 10-Q quarterly and the Form 10-K annually with the SEC, pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78m, and 17 C.F.R. §§ 240.13a-1, 240.13a-13." United States v. McVay, 447 F.3d 1348, 1349 (11th Cir. 2006).

[11] Form S-8 is used to register "[s]ecurities of the registrant to be offered under any employee benefit plan to its employees or employees of its subsidiaries or parents." SEC, Form S-8: Registration Statement Under the Securities Act of 1933, OMB No. 3235-0066, available at http://www.sec.gov/about/forms/forms-8.pdf (last visited May 4, 2012).

expense this compensation. The plaintiffs allege that the defendants knew about the backdating of stock options all along because many of them were directly involved in issuing the stock options, and some of them received backdated stock options. A December 2006 Home Depot news release revealed that an internal investigation had discovered routine backdating at "all levels of the company" beginning as early as 1981. The resulting correction led to a $227 million loss in the company's consolidated financial statements. But see infra note 18.

C.

The putative class action in this case began as three separate class actions, with two filed in New York and one filed in Georgia. All three claimed that the defendants violated ERISA. See 29 U.S.C. §§ 1109, 1132(a)(2). The two New York cases were transferred to Georgia, where the plaintiffs in those two cases voluntarily dismissed their lawsuits and joined the one that had been filed in Georgia all along. After the plaintiffs filed two amended complaints, the district court dismissed their suit with prejudice for lack of standing and, alternatively, because the plaintiffs had not exhausted their administrative remedies. The plaintiffs appealed. We held that the plaintiffs did have standing, but we agreed with the district court that they had not exhausted their administrative remedies. Lanfear v. Home Depot, Inc., 536 F.3d 1217, 1221–24 (11th Cir. 2008). We

reversed the dismissal and remanded the case to the district court to allow it to determine whether the proceedings should be stayed to allow the plaintiffs to pursue administrative relief. Id. at 1225. The plaintiffs then filed in the district court a motion for a stay to allow exhaustion, which that court granted.

After exhausting their administrative remedies, the plaintiffs filed a third amended complaint, asserting six ERISA breach of fiduciary duty claims, two of which are relevant to this appeal. First, the plaintiffs claimed that the defendants breached their duty of prudence by "continu[ing] to offer and approve the Home Depot Stock as an investment option for the Plan," and by "permitt[ing] Company contributions to be made in Home Depot Stock rather than in cash or in other investments." Second, the plaintiffs claimed that the defendants violated their duty of loyalty by incorporating by reference into "Plan documents"—Form S-8s and stock prospectuses—"materially misleading and inaccurate SEC filings and reports" and "fail[ing] to disclose any information to [the Plan participants] regarding Home Depot's deceitful business practices and how these activities adversely affected Company stock as a prudent investment option under the Plan."

The defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. They contended that the prudence claim was actually a failure to diversify claim dressed up as a prudence claim—a

wolf in sheep's clothing[12]—and noted that claims for failure to diversify are barred by 29 U.S.C. § 1104(a)(2). Alternatively, the defendants argued that § 1104(a)(2) creates a presumption of prudence that the allegations in the complaint could not rebut. See Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995). The defendants also argued that there could be no breach of the duty of loyalty because the documents on which the complaint was based were not fiduciary communications. Finally, they argued that there was no general duty under ERISA to inform the Plan participants of nonpublic corporate information.

The plaintiffs responded that, under the Third Circuit's decision in Moench, the presumption that fiduciaries are prudent is rebuttable, and the allegations in their complaint are sufficient to rebut that presumption. And, the plaintiffs argued, the defendants were acting in their fiduciary capacity when they sent the documents that incorporated by reference the inaccurate SEC filings, and they were required to reveal to the plaintiffs "critical information" regarding the Home Depot stock even though it was nonpublic information.

The district court granted the defendants' motion to dismiss all of the claims. In doing so, the court determined that the prudence claim was "at its core a diversification claim" barred by § 1104(a)(2). In the alternative, the court

---

[12] See Aesop, "The Wolf in Sheep's Clothing," in Aesop's Fables, supra note 1, at 125.

concluded that, because the Plan required investment in Home Depot stock, the defendants' decision to invest in Home Depot stock was immune from judicial review. The court also concluded that, even if the defendants had discretion not to invest in Home Depot stock, the plaintiffs' allegations were insufficient to rebut the Moench presumption of prudence; they fell short by not alleging that Home Depot was on the "brink of financial collapse," which would have required the defendants to deviate from the Plan. About the breach of the duty of loyalty claim, the district court concluded that the Home Depot officers did not make the SEC filings in their capacity as Plan fiduciaries and that incorporation of the SEC filings into the Form S-8s and stock prospectuses did not give rise to ERISA liability. It also concluded there was no ERISA-imposed duty to disclose nonpublic corporate information. The district court dismissed the remaining claims as derivative of the prudence and loyalty claims or because they were without merit for some other reason.

This is the plaintiffs' appeal.

## II.

"We review de novo the district court's grant of a motion to dismiss under 12(b)(6) for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Ironworkers

13

Local Union 68 v. AstraZeneca Pharm., LP, 634 F.3d 1352, 1359 (11th Cir. 2011) (quotation marks omitted). "In assessing the sufficiency of the complaint's allegations, we are bound to apply the pleading standard articulated in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937 (2009)." Id. The "allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555, 127 S.Ct. at 1965 (citation omitted). As a result, the plaintiff must plead "a claim to relief that is plausible on its face." Id. at 570, 127 S.Ct. at 1974. And "we may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below." Harris v. United Auto Ins. Grp., Inc., 579 F.3d 1227, 1232 (11th Cir. 2009) (alteration and quotation marks omitted).

### III.

### A.

The plaintiffs contend that the district court erred by dismissing their claim that the defendants violated the fiduciary duty of prudence. They argue that the district court was wrong to conclude that their prudence claim was a camouflaged diversification claim.

14

ERISA fiduciaries operate under a "[p]rudent man standard of care," which requires that:

(1) . . . [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

. . . .

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [and]

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

29 U.S.C. § 1104(a)(1). Section 1104(a)(2) provides an exemption from the diversification requirement of paragraph (C) for plans structured as EIAPs, such as the Plan in this case. "In the case of an [EIAP], the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of employer securities . . . ." Id. § 1104(a)(2). The district court concluded that the plaintiffs' prudence claim was actually, at its core, a claim that the defendants "should have diversified the Plan's investments." Based on that conclusion, the court dismissed the claim because it fit within the § 1104(a)(2) exemption.

15

Although we agree that courts must keep an eye out for wolves in sheep's clothing, we are convinced that the plaintiffs' prudence claim is instead a sheep in sheep's clothing. The plaintiffs allege that the defendants "knew or should have known that . . . Home Depot Stock was not a suitable and appropriate investment for the Plan," that they failed to "divest[] the Plan of Home Depot Stock," that they should not have "permitted Company matching contributions to be made in Home Depot Stock," and that they should not have "continued to offer and approve the Home Depot Stock as an investment option for the Plan." So the plaintiffs' claim, at least in part, is: (1) the defendants knew, based on nonpublic information, about the improper use of return-to-vendor chargebacks and stock option backdating; (2) because of that nonpublic information, the defendants knew that Home Depot's stock price was likely inflated; (3) despite that knowledge the defendants did not divest the Plan of Home Depot stock; and (4) they continued to offer Home Depot stock to the Plan participants and invest matching funds and direct contributions in Home Depot stock.

That is not a claim that the Plan did not have enough different kinds of fruit in its investment basket or had only apples. The plaintiffs recognize that the Plan ordinarily allows the defendants to fill the basket with nothing but apples. Their claim is that the defendants, knowing that apples were selling for more than they

16

were worth, not only left them in the basket but kept adding them to the basket. In short, the plaintiffs allege that the defendants acted imprudently because they knew that Home Depot stock was overpriced, not merely because it made up too large a percentage of the Company Stock Fund.

The Fifth Circuit concluded in Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 249 (5th Cir. 2008), that similar allegations state a claim for violation of the duty of prudence. There the plaintiff alleged that the defendants should have concluded, based on publicly available information, that it was imprudent to invest "such massive amounts or such a large percentage of [the plan's] assets" in the company's own stock. Id. at 248–49. The Fifth Circuit held that was a diversification claim within the § 1104(a)(2) statutory exemption. Id. at 249. But the plaintiff also alleged that the defendants should have concluded, based on nonpublic information, that "it was imprudent for the plan to hold even one share of [the company's] stock," and that the "defendants had a fiduciary duty to halt further purchases of [the company's] common stock, sell the [p]lan's holdings in the [c]ommon [s]tock [f]und, and terminate the [f]und." Id. The Fifth Circuit concluded that was not a diversification claim and for that reason did not fall within the § 1104(a)(2) exemption. Id.

Like the plaintiff in Kirschbaum, the plaintiffs here allege that, even putting

17

aside diversification concerns, Home Depot stock was an imprudent investment and for that reason the defendants had a duty to divest the Plan of the stock and stop purchasing it. That is not a wolf in a wool sweater; it is a sure-enough sheep. It does not howl "diversify"; it bleats "prudence." Because the plaintiffs' claim is not a diversification claim, it does not fall within the § 1104(a)(2) exemption.

B.

The district court alternatively concluded that the defendants had no discretion not to invest in Home Depot stock. Relying on the Third Circuit's decision in Moench, it concluded that even if the prudence claim actually was a prudence claim, the defendants' lack of discretion shielded them from judicial review. See Moench, 62 F.3d at 567 n.4, 571. The plaintiffs counter that the defendants had at least some discretion to stop buying and start selling Home Depot stock, and as a result their actions are not immune from judicial review.

The Plan did provide the defendants with some discretion. Although it required a Company Stock Fund as an investment option, it did not require that fund to be invested exclusively in Home Depot stock. The Plan defined the Company Stock Fund as "the Investment Fund invested primarily in shares of Company Stock." (Emphasis added.) In another part, it also provided that,

18

"[n]otwithstanding anything in the Plan to the contrary, the Plan shall be invested primarily in Company stock." (Emphasis added.) Primarily does not mean exclusively; primarily exclusively means primarily.

Because the Plan did not require the defendants to invest exclusively in Home Depot stock, "they retained limited discretion over investment decisions." Edgar v. Avaya, Inc., 503 F.3d 340, 345 (3d Cir. 2007) (citing Moench, 62 F.3d at 568); see also Pfeil v. State St. Bank & Trust Co., 671 F.3d 585, 591 (6th Cir. 2012) ("[A]n ESOP fiduciary may be liable for failing to diversify plan assets even where the plan required that an ESOP invest primarily in company stock." (emphasis added)); Edgar, 503 F.3d at 343, 345 & n.8. The limitation on their discretion was the Plan's requirement that the fund's primary investment be Home Depot stock. So long as that requirement was met, the defendants had discretion to sell Home Depot stock or to stop investing in it. Their exercise of that discretion, or failure to exercise it, is subject to judicial review to determine if they violated their duty of prudence.[13]

_____

[13] One might argue that even where the plan requires fiduciaries to buy and hold company stock, they still have discretion not to do so where it is plain that it would be imprudent to follow the plan directions. See 29 U.S.C. § 1104(a)(1)(B); id. § 1104(a)(1)(D) ("[A] fiduciary shall discharge his duties in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]."); see also Pfeil, 671 F.3d at 591 ("[A]n ESOP fiduciary must follow the plan documents but only insofar as such documents and instruments are consistent with the provisions of ERISA."). We need not decide that issue in this case, which presents a different question:  whether, under the

19

## C.

We now reach the district court's second alternative holding: even if the defendants' decisions were subject to judicial review, the plaintiffs' allegations were insufficient to rebut the <u>Moench</u> presumption of prudence because the plaintiffs did not and could not allege that Home Depot was on the "brink of financial collapse." If that is right, the complaint does not state a claim for breach of the duty of prudence. The plaintiffs attack that reasoning on three fronts. They argue that we should not adopt the presumption of prudence analysis from <u>Moench</u>; they argue that "brink of financial collapse" is the wrong standard for overcoming the presumption of prudence; and they argue that the presumption of prudence should not, in any event, be applied at the motion to dismiss stage of litigation.

## 1.

About the Third Circuit's <u>Moench</u> approach, the plaintiffs argue that any direction the Plan gives the fiduciaries to invest in Home Depot stock is "facially subservient" to the general duty of prudence that § 1104(a)(1)(D) imposes and, for that reason, we should not presume prudence from compliance with the terms of

_____

circumstances, the defendant fiduciaries abused the discretion they had under the plan to continue buying and holding company stock.

20

the Plan. We disagree.

The goals of ERISA and the ESOP plans it permits conflict to some extent.[14] On one hand, "Congress enacted ERISA to 'protect[] employee pensions and other benefits.'" In re Citigroup ERISA Litig., 662 F.3d 128, 136–37 (2d Cir. 2011) (quoting Varity Corp v. Howe, 516 U.S. 489, 496, 116 S.Ct. 1065, 1070 (1996)). And the duty of prudence the statute imposes requires diversification of investments to lower risk. On the other hand, ESOP plans are "designed to invest primarily in qualifying employer securities" in order to give employees an ownership stake in the company. 29 U.S.C. § 1107(d)(6)(A). And the nondiversification that is a necessary part of ESOP plans places "'employee retirement assets at much greater risk than does the typical diversified ERISA plan.'" In re Citigroup, 662 F.3d at 137 (quoting Martin v. Feilen, 965 F.2d 660, 664 (8th Cir. 1992)). So, ERISA requires diversification to further the goal of protecting employee benefits while at the same time permitting concentration in the employer's stock in order to further the goal of employee ownership. As the Fifth Circuit put it, "Congress has expressed a strong preference for plan investment in the employer's stock, although this preference may be in tension

---

[14] Although we single out ESOP plans, our analysis also applies to EIAPs that encourage or require investment in employer stock and to the fiduciaries of those plans.

with ERISA's general fiduciary duties." Kirschbaum, 526 F.3d at 253.

What this means for ESOP fiduciaries is that they still must "act in accordance with the duties of loyalty and care that apply to fiduciaries of typical ERISA plans," but they also must carry out their duties "aris[ing] out of the nature and purpose of ESOPs themselves." Edgar, 503 F.3d at 346 (quotation marks omitted). ESOP fiduciaries are exempt from the duty to diversify; indeed, they have a duty not to diversify. ESOP fiduciaries are not required to prudently diversify investments; they are required not to diversify, which may be imprudent. They are also exempt from any duty not to deal with a party in interest to the extent that they must deal with the company. See id. (citing Moench, 62 F.3d at 568); see also 29 U.S.C. § 1106(b)(1); Pfeil, 671 F.3d at 591 ("An ESOP promotes a policy of employee ownership by modifying the fiduciary duty to diversify plan investments and the prudence requirement to the extent that it requires diversification." (citation omitted)). "In other words, 'Congress expressly intended that the ESOP would be both an employee retirement benefit plan and a "technique of corporate finance" that would encourage employee ownership.'" Moench, 62 F.3d at 569 (quoting Martin, 965 F.2d at 664). Congress commanded the conflict, or at least permitted it.

Noting this conflict and the special nature of ESOP fiduciaries, the Third

Circuit in Moench addressed the question of how courts should review the decisions of ESOP fiduciaries to determine whether they complied with the ERISA duty of prudence. It reasoned that "courts must find a way for the competing concerns to coexist." Moench, 62 F.3d at 570. Borrowing heavily from trust law, the Third Circuit concluded that where "the fiduciary is not absolutely required to invest in employer securities but is more than simply permitted" to do so, the fiduciary "should not be immune from judicial inquiry, as a directed trustee essentially is, but also should not be subject to the strict scrutiny that would be exercised over a trustee only authorized to make a particular investment." Id. at 571. It concluded, therefore, that the fiduciary's "decision to continue investing in employer securities should be reviewed [only] for an abuse of discretion." Id. It termed this forgiving standard of review a "presumption," with an ESOP fiduciary to be presumed prudent for investing in, or continuing to hold, employer securities consistently with the terms of the plan. Id. A plaintiff can overcome that presumption only by showing that the "fiduciary abused its discretion by investing in employer securities" or continuing to hold them. Id.

The Second, Ninth, Fifth, and Sixth Circuits have all adopted the Third Circuit's Moench presumption of prudence or abuse of discretion standard. See In re Citigroup, 662 F.3d at 138; Quan v. Computer Scis. Corp., 623 F.3d 870, 881

23

(9th Cir. 2010); Kirschbaum, 526 F.3d at 253–56; Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995).  In doing so, three of those four circuits noted that a less forgiving standard of judicial review could subject fiduciaries to liability if they adhered to the plan's terms and the stock price fell or if they deviated from the plan and the stock price rose.  See In re Citigroup, 662 F.3d at 138; Quan, 623 F.3d at 881; Kirschbaum, 526 F.3d at 256 n.13.  Closer judicial scrutiny would force ESOP fiduciaries to choose between the devil and the deep blue sea.  We join our five sister circuits in not putting ESOP fiduciaries to that choice.  We will review only for an abuse of discretion the defendants' decision to continue investing in and holding Home Depot stock in compliance with the directions of the Plan.[15]

---

[15] The plaintiffs contend that the Secretary of Labor's contention in her amicus brief that a presumption of prudence "should not apply to a fiduciary's knowing purchases of imprudently overpriced investments" is somehow due deference under Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778 (1984).  But an agency's interpretation of a statute in an amicus brief is entitled to, at most, Skidmore deference.  See Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1305 (11th Cir. 2005); see also Riegel v. Medtronic, Inc., 552 U.S. 312, 338 n.8, 128 S.Ct. 999, 1016 n.8 (2008) (Ginsburg, J., dissenting) ("An amicus brief interpreting a statute is entitled to, at most, deference under Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161 (1944).").  Under Skidmore, the weight given to an agency's position "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  323 U.S. at 140, 65 S.Ct. at 164.  The plaintiffs make no argument as to why any of those factors should lead us to defer, and we are not persuaded that we should.

Alternatively, even if the district court's application of the presumption of prudence with its abuse of discretion standard of scrutiny was error in this case, it was invited error.  In the

24

2.

Applying that standard, the district court concluded that the presumption of prudence had not been overcome, that no abuse of fiduciary discretion had been shown. It based that conclusion on the absence of any allegation that Home Depot had been on the "brink of financial collapse" at the time the defendants bought and continued to hold its stock. The plaintiffs challenge the court's premise that fiduciaries abuse their discretion in buying or holding company stock only if the company is about to collapse and the fiduciaries know it. There is merit to that challenge.

The district court drew its "brink of financial collapse" rule from some of its own decisions that had interpreted Moench and cases applying it. See, e.g., Pedraza v. Coca-Cola Co., 456 F. Supp. 2d 1262, 1274–76 (N.D. Ga. 2006). In Pedraza, the district court concluded that the Moench presumption could be overcome only by allegations that the fiduciary continued to comply with a plan's instructions to purchase or hold employer securities despite knowledge that the employer was on the brink of collapse. Id. at 1275–76. The district court and the

---

plaintiffs' response to the defendants' motion to dismiss, that was the only standard the plaintiffs put forth in support of their position that they had stated a claim. The district court, in reaching its alternative holding, accepted the plaintiffs' invitation to apply that standard. "It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1293–94 (11th Cir. 2002) (quotation marks omitted).

25

decisions it relied on for that rule misinterpreted the Moench standard.

In Moench itself, the Third Circuit examined an ESOP plan similar to the one in this case. The court noted that the plaintiff in Moench had argued "that the precipitous decline in the price of [his employer's] stock, as well as the [fiduciary's] knowledge of [his employer's] impending collapse and [the fiduciary's] own conflicted status" had made disobeying the plan's directions the only prudent choice for the fiduciary. 62 F.3d at 572. That was a description of the plaintiff's allegations and argument, not a holding of the court. The Third Circuit never said that the only circumstance in which a fiduciary could abuse its discretion by following an ESOP plan's directions about company stock was when the fiduciary knew that the company was peering over the precipice into a financial abyss. Instead, the Moench court borrowed from trust law to hold that a plaintiff had to "show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." Id. at 571.

Other courts have adopted much the same test. See, e.g., In re Citigroup, 662 F.3d at 140; Kirschbaum, 526 F.3d at 256; Pugh v. Tribune Co., 521 F.3d 686, 701 (7th Cir. 2008) ("[T]he plaintiff must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the

26

circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." (quotation marks omitted)); Summers v. State St. Bank & Trust Co., 453 F.3d 404, 410 (7th Cir. 2006) (same); see also In re Syncor ERISA Litig., 516 F.3d 1095, 1102 (9th Cir. 2008) ("While financial viability is a factor to be considered, it is not determinative of whether the fiduciaries failed to act with care, skill, prudence, or diligence."); Edgar, 503 F.3d at 348, 349 n.13 (quoting the standard from Moench and noting that it did "not interpret Moench as requiring a company to be on the brink of bankruptcy" before the fiduciary is required to deviate from the plan).

We agree with those courts and adopt that test. ERISA's "fiduciary responsibilities provisions codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110, 109 S.Ct. 948, 954 (1989) (alterations, citations, and quotation marks omitted). So, in ERISA cases, "we are guided by principles of trust law." Id. at 110, 109 S.Ct. at 954. Under the law of trusts, a trustee has a general "duty to conform to the terms of the trust directing or restricting investments by the trustee." Restatement (Third) of Trusts § 91(b); see also Restatement (Second) of Trusts § 227(c). But a trustee should deviate from the terms of the trust "where[,] owing to circumstances not known to the settlor

27

and not anticipated by him[,] compliance would defeat or substantially impair the accomplishment of the purposes of the trust." Restatement (Second) of Trusts §§ 167(1), 227 cmt. q.

Although a fiduciary is generally required to invest according to the terms of the plan, when circumstances arise such that continuing to do so would defeat or substantially impair the purpose of the plan, a prudent fiduciary should deviate from those terms to the extent necessary. Because the purpose of a plan is set by its settlors (those who created it), that is the same thing as saying that a fiduciary abuses his discretion by acting in compliance with the directions of the plan only when the fiduciary could not have reasonably believed that the settlors would have intended for him to do so under the circumstances. That is the test.

3.

The plaintiffs also contend that the presumption of prudence analysis and the test it includes cannot be applied to dismiss a claim under Rule 12(b)(6). They argue that presumptions are evidentiary and evidence has no place in determining whether a complaint states a valid claim. The plaintiffs' argument is based on the Moench court's unfortunate use of the word "presumption." The court did not intend to use, and we disavow any intention of using, the word "presumption" in a sense that has any evidentiary weight. Instead, in this context the term embodies

28

the notion of an outcome favored by the law; it prescribes who is to win in almost all of the circumstances that can be envisioned—not all, but almost all.  See In re Citigroup, 662 F.3d at 139 ("The 'presumption' is not an evidentiary presumption; it is a standard of review applied to a decision made by an ERISA fiduciary."); Edgar, 503 F.3d at 349.  The Moench standard of review of fiduciary action is just that, a standard of review; it is not an evidentiary presumption.  It applies at the motion to dismiss stage as well as thereafter.[16]

Because we apply an abuse of discretion standard to a fiduciary's decision to continue to invest or to remain invested in company stock in obedience to the plan's directions, an abuse of discretion is an element of a claim that the fiduciary's decision was imprudent.  Cf. Edgar, 503 F.3d at 349.  Unless a plaintiff pleads facts sufficient to raise a plausible inference that the fiduciary abused its discretion by following the plan's directions, the complaint fails to state a valid claim and a motion to dismiss should be granted.  See Edgar, 503 F.3d at 349; In

---

[16] The Sixth Circuit has concluded to the contrary, stating that "the presumption of reasonableness . . . is not an additional pleading requirement and thus does not apply at the motion to dismiss stage."  Pfeil, 671 F.3d at 592; see also id. at 593 (classifying the Moench presumption as "an evidentiary presumption, and not a pleading requirement").  It also puts less deference behind the presumption than the Second or Third Circuits do.  Compare  Pfeil, 671 F.3d at 591, with In re Citigroup, 662 F.3d at 140, and Edgar, 503 F.3d at 348.  We think that the reasoning of those other two circuits is more persuasive than the Sixth Circuit's, and we align ourselves with them.

re Citigroup, 662 F.3d at 139.

D.

All that remains is to apply that standard to the plaintiffs' complaint. The plaintiffs base their allegation that Home Depot stock was an imprudent investment during the relevant period on the change in its market price after the company released the earnings report reflecting the effect of the illicit return-to-vendor chargebacks. On February 18, 2005, the day before it released earnings data reflecting the improper return-to-vendor chargebacks, Home Depot stock traded at $42.02 per share. By April 28, 2005, it had fallen by about 16.5% to $35.09. By July 22, 2005, however, the price had risen to $43.47,[17] an increase of nearly 3.5% over the price of the stock before the return-to-vendor chargeback fraud negatively affected Home Depot's reported earnings.[18]

"Mere stock fluctuations, even those that trend downward significantly, are insufficient to establish" that a fiduciary abused its discretion by continuing to

_____

[17] Not all of these stock prices are in the complaint, but under Federal Rule of Evidence 201(b), we can take judicial notice of the price of a stock on any given day. See La Grasta v. First Union Sec., Inc., 358 F.3d 840, 842 (11th Cir. 2004).

[18] The plaintiffs have never alleged that the release of information about the backdating of stock options led to a drop in Home Depot's stock price. The stock closed at $39.37 on December 5, 2006, the day before it released information about the backdated stock options. The price did fall by about 1% to $38.93 on December 7, 2006, but that drop was close to the one in the broader market on that day. By December 14, 2006, the stock price closed at $39.97, which is about 1% higher than its December 5, 2006, closing price.

invest in or hold employer securities in compliance with the terms of the plan. Wright v. Or. Metallurgical Corp., 360 F.3d 1090, 1099 (9th Cir. 2004). A 16.5% decrease in stock price over a period of more than two months, followed by a rebound in the price a few months later, does not indicate that the undisclosed problem was the "type of dire situation which would require defendants to disobey the terms of the Plan[] by not offering the [Company Stock Fund] as an investment option, or by divesting the Plan[] of [Home Depot] securities." Edgar, 503 F.3d at 348. The defendants were not required to depart from the Plan's directives regarding Home Depot stock just because they were aware that the stock price likely would fall. See Kirschbaum, 526 F.3d at 256 ("One cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions.").

Even accepting all of the allegations in the complaint as true and viewing all of the facts in the light most favorable to the plaintiffs, the defendants could have reasonably believed that the Plan's settlors would have intended that their instructions be followed in the circumstances involved in this case. Settlor directions in retirement plans, like those in trust instruments, are usually designed for the long haul. Market timing is not how prudent pension fund investing

31

usually works, and there is nothing in this Plan to indicate that those who created it intended for fiduciaries to disregard their instructions based on short-term events and fluctuations in the market.

The result we reach does not disadvantage plan participants compared to shareholders generally. Instead, it refuses to provide participants with an unfair advantage over other shareholders. Just as plan participants have no right to insist that fiduciaries be corporate insiders, they have no right to insist that fiduciaries who are corporate insiders use inside information to the advantage of the participants.

Because the plaintiffs have not pleaded facts establishing that the defendants abused their discretion by following the Plan's directions, they have not stated a valid claim for breach of the duty of prudence. See Edgar, 503 F.3d at 348.

IV.

The plaintiffs' final contention is that the district court erred by dismissing their claim that the defendants violated their fiduciary duty of loyalty. They argue that they stated a breach of loyalty claim in two ways. One way is by alleging that the defendants made misrepresentations in their SEC filings that were sent to, or were accessible to, Plan participants. The other way is by alleging that the

defendants were required to, and failed to, inform the Plan participants of Home Depot's business practices and the effect those practices would likely have on its stock price when they became public. We are not convinced.

A.

As to the plaintiffs' first argument, their position is that when the defendants took the inaccurate statements in the Form 10-K annual reports and in the Form 10-Q quarterly reports and put them into the Form S-8s and into the stock prospectuses, those inaccurate statements were transformed from misrepresentations in an SEC filing into "fiduciary communications." As we have pointed out, however, "ERISA recognizes that a person may be a fiduciary for some purposes and not others." Local Union 2134 v. Powhatan Fuel, Inc., 828 F.2d 710, 714 (11th Cir. 1987) (quotation marks omitted). The defendants "assume[d] fiduciary status only when and to the extent that they function[ed] in their capacity as . . . plan fiduciaries, not when they conduct[ed] business that is not regulated by ERISA." Id. (quotation marks omitted); see also Barnes v. Lacy, 927 F.2d 539, 544 (11th Cir. 1991) ("[P]lan administrators assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." (quotation marks omitted)).

It is securities law, not ERISA, that requires registration of securities including the filing of a registration statement. See 15 U.S.C. §§ 77e–77h. Employers may use the Form S-8 registration statement for their securities that are "offered to its employees or employees of its subsidiaries or parents under any employee benefit plan." 17 C.F.R. § 239.16b(a)(1). Securities law also requires employers to create stock prospectuses and give them to their employees if they intend to offer the employees their securities under any employee benefit plan. See 15 U.S.C. § 77j; 17 C.F.R. §§ 230.428, 239.16b(a)(1). So when filing the Form S-8 registration statements, creating the stock prospectuses and giving them to employees, the defendants were not acting "in their capacity as . . . plan fiduciaries" because they were "conduct[ing] business that is not regulated by ERISA." Local Union 2134, 828 F.2d at 714; see also Barnes, 927 F.2d at 544; Kirschbaum, 526 F.3d at 257 ("When it incorporated its SEC filings into the Form S-8 and 10a Prospectus, [the defendant] was discharging its corporate duties under the securities laws, and was not acting as an ERISA fiduciary.").

In Kirschbaum the Fifth Circuit rejected the same "incorporation by reference" argument that the plaintiffs make here. In that case, the plaintiff brought an ERISA claim based on alleged misrepresentations that the corporation and its officers, who were the plan fiduciaries, made in Form 10-K and Form 10-Q

34

filings with the SEC. <u>Kirschbaum</u>, 526 F.3d at 256–57. The plaintiff argued that those misrepresentations became fiduciary communications when the defendants incorporated them by reference into a Form S-8 registration statement that was filed with the SEC and again into a stock prospectus sent to employees. <u>Id.</u> at 257. The Fifth Circuit rejected the plaintiff's incorporation by reference argument because when the defendants incorporated the alleged misrepresentations into the Form S-8 and prospectus, they were acting on behalf of the corporation and not as ERISA fiduciaries. <u>Id.</u> Noting that the requirements to file the Form S-8 and to create and distribute the stock prospectuses arose under securities law, the Fifth Circuit reasoned that "[t]hose who prepare and sign [them] do not become ERISA fiduciaries through those acts, and consequently, do not violate ERISA if the filings contain misrepresentations." <u>Id.</u> (quotation marks omitted).

We reach the same conclusion for the same reason. When the defendants in this case filed the Form S-8s and created and distributed the stock prospectuses, they were acting in their corporate capacity and not in their capacity as ERISA fiduciaries, <u>see id.</u>, because they were conducting business that was regulated by securities law and not by ERISA, <u>see Local Union 2314</u>, 828 F.2d at 714. Because they were not acting as fiduciaries when they took those actions, any misrepresentations in those documents did not violate ERISA. <u>See Kirschbaum</u>,

526 F.3d at 257.

B.

As to the plaintiffs' second breach of duty of loyalty argument, their position is that the defendants had a duty to "disclose problems which affected Plan benefits, including material information that would affect the Fund's value." They argue that there is a "duty to inform when the trustee knows that silence might be harmful." Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993). The plaintiffs argue that the defendants breached that duty by not disclosing information about Home Depot's "deceitful business practices" and the effect those practices had on the question of whether it was prudent to buy or hold Home Depot stock.

We have recognized that an ERISA fiduciary may be liable for withholding information from plan participants. See Jones v. Am. Gen. Life Ins. & Accident Co., 370 F.3d 1065, 1072 (11th Cir. 2004) ("[A]n ERISA plan administrator's withholding of information may give rise to a cause of action for breach of fiduciary duty."); Ervast v. Flexible Prods. Co., 346 F.3d 1007, 1016 n.10 (11th Cir. 2003) (noting in dicta that "an ERISA participant has a right to information and . . . a failure-to-inform claim may lie against an ERISA administrator"). We are reluctant, however, "to broaden the application of these cases to create a duty

36

to provide participants with nonpublic information pertaining to specific investment options." In re Citigroup, 662 F.3d at 143. And even though it contains "detailed disclosure rules by which employers and plan administrators must abide," Barnes, 927 F.2d at 543, ERISA does not explicitly impose a duty to provide participants with nonpublic information affecting the value of the company's stock, see generally 29 U.S.C. §§ 1021–1030.

In Edgar, the Third Circuit rejected a disclosure claim similar to the one the plaintiffs make here. 503 F.3d at 349–50. In doing so, the court pointed out that ERISA required that summary plan descriptions, which are provided to plan participants, contain a number of disclosures. Id. at 350; see also 29 U.S.C. §§ 1021–1022. Among other things, those documents inform participants "that their investments are tied to the market performance of the funds; that each fund carries different risks and potential returns; . . . [and] that there are particular risks associated with investing in a non-diversified fund." Edgar, 503 F.3d at 350. The court reasoned that those "disclosures were sufficient to satisfy defendants' obligation not to misinform participants . . . . [and] provided Plan participants the opportunity to make their own informed investment choice." Id. (citation omitted). As a result, plan fiduciaries do "not have a duty to give investment advice or to opine on the stock's condition." Id. (quotation marks omitted).

37

The Second Circuit reached the same result in In re Citigroup, concluding that there was no general duty to disclose nonpublic information about "specific investment options" because doing so "would improperly transform fiduciaries into investment advisors." 662 F.3d at 143 (quotation marks omitted). The court explained that fiduciaries had (apparently in the summary plan description) "provided adequate warning that the Stock Fund was an undiversified investment subject to volatility and that Plan participants would be well advised to diversify their retirement savings." Id. The fiduciaries had no duty to go beyond that warning and provide the participants with nonpublic information that might "manifest itself in a sharp decline in stock price." Id.

We agree with the Third and Second Circuits. As we mentioned earlier in this opinion, the summary plan description sent to all of the Plan participants contained statements about the risk that participants faced from investing in the Common Stock Fund. That document contained the following warning: "Keep in mind that the different investment options offered carry different levels of risk. Higher risk investments may provide higher returns over the long term, but there's also a greater chance that you might lose a portion of your investment." The summary plan description also contained a graph reflecting the relative risk of the different funds, which emphasized that the Common Stock Fund is the riskiest

38

one.  That graph described the fund with these terms:  "Most Aggressive," "Higher Potential Return," "Higher Risk," "Higher Potential Volatility."  The text of the summary plan description also added this warning:  "Since [the Common Stock Fund] invests in only one stock, this fund is subject to greater risk than the other funds in the plan."  All of those warnings adequately informed the participants about the risks of investing in the Common Stock Fund with its concentration in Home Depot stock.[19]

We will not create a rule that converts fiduciaries into investment advisors.  Such a rule would force them to guess whether, and if so to what extent, adverse nonpublic information will affect the price of employer stock, and then would require them to disclose that information to the plan participants if they believe that the information will have a materially adverse effect on the value of the investment fund.  There are, of course, also practical problems with such a rule.  It would be difficult, if not impossible, to whisper nonpublic information into the

---

[19] One of the risks of a nondiverse investment is, of course, the risk that the company will engage in fraudulent activity, a risk that can be minimized through diversification.  See Richard A. Posner, Economic Analysis of the Law 473 (5th ed. 1998) (noting that unsystematic risk—the risk uncorrelated with the market as a whole—"can be diversified away"); Houman B. Shadab, The Law and Economics of Hedge Funds:  Financial Innovation and Investor Protection, 6 Berkeley Bus. L.J. 240, 286 (2009) ("[F]raud is a type of idiosyncratic risk that can be minimized through diversification . . . ."); Ralph K. Winter, On 'Protecting the Ordinary Investor', 63 Wash. L. Rev. 881, 891 (1988) ("Fraud is a species of unsystematic risk against which diversification provides protection . . . .").

ears of tens of thousands of plan participants without it becoming immediately available to the market as a whole, thus blowing any benefit to the participants. And even if it were possible to disclose nonpublic information to all plan participants without that information becoming generally known, the participants have no legal claim to it. The only way selective disclosure could benefit them would be if it gave participants an advantage in the market over non-participants, and they are not entitled to that advantage. ERISA does not require that fiduciaries be corporate insiders, and the rule we adopt puts plan participants in the same position they would be in if outside fiduciaries were used.

For these reasons, the plaintiffs have failed to state a viable breach of loyalty claim, and the district court did not err in dismissing that part of their complaint.[20]

V.

The district court's order dismissing the plaintiffs' third and last amended complaint is **AFFIRMED**.

---

[20] The district court dismissed the three claims in Counts 3, 5, and 6 because they are derivative of the plaintiffs' claims that the defendants breached their duties of prudence and loyalty. The plaintiffs do not deny that those claims are derivative, and our decision to affirm the dismissal of the primary claims means that the dismissal of those claims is also due to be affirmed. The district court dismissed Count 4 for its own lack of merit, and because the plaintiffs have not contested that dismissal in this appeal, it is also due to be affirmed. See Norelus v. Denny's Inc., 628 F.3d 1270, 1297 (11th Cir. 2010).

40